1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   STEVEN MANDELAS,                          CASE NO. C10-0594JLR

11                      Plaintiff,              ORDER ON MOTION FOR
                                               SUMMARY JUDGMENT
12              v.

13   DANIEL N. GORDON, PC, et al.,

14                      Defendants.

15          This matter comes before the court on Defendant Daniel N. Gordon, PC's

16   ("Gordon") motion for summary judgment (Dkt. # 47).  Plaintiff Steven Mandelas

17   opposes Gordon's motion.  (Dkt. # 51.)  Having considered the submissions of the

18   parties, the record, and the relevant law, and having heard oral argument, the court

19   GRANTS in part and DENIES in part Gordon's motion (Dkt. # 47).

20

21

22

ORDER- 1

# I.    BACKGROUND[1]

This action arises out of the efforts of Gordon, an Oregon-based law firm, to collect a debt that Mr. Mandelas owed to former Defendant CACV of Colorado, LLC ("CACV").[2]   On December 14, 2006, the National Arbitration Forum ("NAF") entered an arbitration award against Mr. Mandelas and in favor of CACV.  (Aylworth Aff. (Dkt. # 49) ¶ 2.)  Gordon did not represent CACV in the arbitration proceedings.  (*Id.*)  In February 2007, CACV forwarded its claim against Mr. Mandelas to Gordon for collection.  (*See id.* Ex. 9.)

On February 27, 2007, Gordon issued a summons in connection with a lawsuit that it planned to file in King County District Court to confirm the arbitration award.  (*Id.* Ex. 1.)  In April 2007, Gordon hired a process server, I-5 Legal, to serve Mr. Mandelas.  (*Id.* Ex. 9.)  On October 7, 2007, I-5 Legal served the summons and the application for an order to confirm arbitration award by leaving copies of the documents with "John Doe,

---

[1]In his response to Gordon's motion, Mr. Mandelas cites the transcript of the April 1, 2010 deposition of Matthew Aylworth taken in this case, which he purports to have filed as Exhibit L to the Ehrlich Declaration.  (*See* Ehrlich Decl. (Dkt. ## 52 (sealed), 67 (redacted)) ¶ 12.)  Mr. Ehrlich, however, attached Mr. Aylworth's December 17, 2010 deposition, which did not contain the cited information.  (*See* Ehrlich Decl. Ex. L.)  Recognizing that this was likely a clerical error, the court ordered Mr. Mandelas to file a new or amended declaration of Mr. Ehrlich attaching the transcript of Mr. Aylworth's April 1, 2010 transcript.  (Dkt. # 76.)  Mr. Mandelas has not provided the court with an Exhibit L that corresponds to the Ehrlich Declaration and that contains the information cited in his response.  (*See* Dkt. ## 79, 83.)

The court does not include in its recitation of facts any evidence from Exhibit L to the Ehrlich Declaration because it is not properly before the court.  *See* Fed. R. Civ. P. 56(c) (factual positions in support of or in opposition to a motion for summary judgment must be supported by admissible evidence).  Nevertheless, as discussed below, even if Mr. Mandelas had filed the correct deposition, it would not have affected the result in this case.

[2] In December 2010, Mr. Mandelas entered into a settlement with CACV and voluntarily dismissed it from this lawsuit.  (Dkt. # 34.)

1   Resident" at 2427 SW 152nd Street, Seattle, WA.  (*Id.* Ex. 3.)  The declaration of service

2   filed by Rich Marlow, I-5 Legal's process server, described John Doe as a white male,

3   age 50, with brown hair, who was 5'10" and weighed 200 pounds.  (*Id.*)

4       Although the declaration of service states that the process server delivered the

5   documents to Mr. Mandelas's correct address, Mr. Mandelas did not receive the

6   documents.  Mr. Mandelas resided at the 152nd Street address, but he was not home on

7   October 7, 2007.  (Ehrlich Decl. (Dkt. ## 52 (sealed), 67 (redacted)) Ex. M ("Mandelas

8   Dep.") at 15.)  Instead, he was in Palm Springs, California between October 4, 2007 and

9   Thanksgiving, 2007.  (*Id.*)  No man fitting John Doe's description resided in Mr.

10  Mandelas's home, and although Mr. Mandelas had given copies of his keys to his mother

11  and to a female friend, he does not know of any man fitting John Doe's description who

12  would have been at his home to accept service on October 7, 2007.  (*Id.* at 7-8, 15.)

13      On October 31, 2007, Gordon filed the application to confirm the arbitration

14  award in King County District Court.  (Aylworth Aff. Ex. 8 at 2.)  I-5 Legal filed the

15  declaration of service.  Mr. Mandelas made no filing in response to the application to

16  confirm the arbitration award.  On January 23, 2008, the state court entered the order

17  confirming the arbitration award and entered judgment against Mr. Mandelas in the

18  amount of $15,052.42, plus 12% interest from the date of the arbitration award.  (*Id.* Ex.

19  4.)  The court entered a corrected judgment on May 12, 2008.  (*Id.* Ex. 5.)

20      In May 2008, following entry of the corrected judgment, Gordon began to attempt

21  to contact Mr. Mandelas.  (Aylworth Aff. Ex. 9; Mandelas Dep. at 16 (stating that his

22  family received calls and that he may have received calls but did not answer calls from

1  blocked numbers).)  On June 9, 2008, Mr. Mandelas called Gordon.  (Aylworth Aff. Ex.

2  9; Mandelas Dep. at 16.)  Gordon's representative told Mr. Mandelas that there was a

3  judgment against him for $15,000 as a result of the NAF arbitration.  (Mandelas Dep. at

4  16.)  Mr. Mandelas told Gordon that the debt was in dispute and that he assumed it had

5  been dropped.  (*Id.* at 18.)  He also told Gordon that he was not in town on the date he

6  was allegedly served, and he asked Gordon to send him a copy of the judgment and

7  related documents.  (*Id.*)  Gordon sent Mr. Mandelas the documents that he requested.

8  (Aylworth Aff. Exs. 7, 9.)  Mr. Mandelas did not challenge I-5 Legal's declaration of

9  service or otherwise contest the state court's entry of judgment.

10       Mr. Mandelas did not contact Gordon after the June 9, 2008 telephone call.

11  (Mandelas Dep. at 21)  According to its records, Gordon attempted to call Mr. Mandelas

12  11 times between June 9, 2008 and September 10, 2009, but was unable to reach him.

13  (Aylworth Aff. Exs. 8, 9.)  Mr. Mandelas testified that he occasionally received voicemail

14  messages stating that it was important for him to return the call.  (Mandelas Dep. 20-21.)

15  The messages, however, did not indicate that they were from a debt collector, and Mr.

16  Mandelas never returned the calls.  (*Id.*)[3]

17       On September 28, 2009, Gordon filed an application for a writ of garnishment

18  with the King County District Court.  (Ehrlich Decl. Ex. E.)  On October 6, 2009, the

19  state court entered the writ of garnishment.  (*Id.* Ex. F.)

20

21       _____

22       [3] Mr. Mandelas brings no claims in this action based on the telephone calls or voice messages.

ORDER- 4

1       Gordon filed an affidavit with the state court in which it stated that it mailed

2   copies of the writ of garnishment to Mr. Mandelas and to the garnishee on December 3,

3   2009.  (Aylworth Aff. Ex. 13.)  Mr. Mandelas, however, did not receive the notice of

4   garnishment that Gordon had sent to him.  In December 2009, Mr. Mandelas's bank

5   notified him of the order requiring attachment of funds from his bank account; this was

6   the first time Mr. Mandelas learned about the writ of garnishment.  (Mandelas Dep. at

7   19.)

8       On December 8, 2009, Mr. Mandelas called Gordon regarding the garnishment.

9   (*Id.*)  Gordon's representative told Mr. Mandelas that there was a judgment against him

10  for $17,441.  (*Id.*)  Mr. Mandelas eventually received a copy of the writ of garnishment

11  from Gordon on December 21, 2009.  (*Id.* at 10.)

12      On April 8, 2010, Mr. Mandelas filed the instant lawsuit.  (Compl. (Dkt. # 1); Am.

13  Compl. (Dkt. # 4) (addressing formatting problems in the original complaint).)  Mr.

14  Mandelas claims that Gordon's conduct in collecting the debt violated the Fair Debt

15  Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.*, the Washington

16  Collection Agency Act ("WCAA"), ch. 19.16 RCW, and the Washington Consumer

17  Protection Act ("WCPA"), ch. 19.86 RCW.

18                  **II.    ANALYSIS**

19  **A.    Summary Judgment Standard**

20      Summary judgment is appropriate if the pleadings, the discovery and disclosure

21  materials on file, and any affidavits, when viewed in the light most favorable to the non-

22  moving party, "show that there is no genuine dispute as to any material fact and the

1    movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.*

2    *v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. County of Los Angeles*, 477 F.3d 652, 658

3    (9th Cir. 2007).  The moving party bears the initial burden of showing there is no genuine

4    issue of material fact and that he or she is entitled to prevail as a matter of law.  *Celotex*,

5    477 U.S. at 323.  If the moving party meets his or her burden, the nonmoving party must

6    go beyond the pleadings and identify facts which show a genuine issue for trial.  *Cline v.*

7    *Indus. Maint. Eng'g. & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000).

8    **B.**    **FDCPA Claims**

9          "The purpose of the FDCPA is to protect vulnerable and unsophisticated debtors

10    from abuse, harassment, and deceptive collection practices."  *Guerrero v. RJM*

11    *Acquisitions LLC*, 499 F.3d 926, 938 (9th Cir. 2007).  Section 1692f of the FDCPA

12    prohibits a debt collector from using "unfair or unconscionable means to collect or

13    attempt to collect any debt."  15 U.S.C. § 1692f.  In addition to this general ban on unfair

14    or unconscionable means of debt collection, § 1692f provides a non-exclusive list of eight

15    prohibited means of debt collection.  *Id.* § 1692f(1)-(8).  This list includes, but is not

16    limited to, such actions as collecting an amount not expressly authorized by agreement or

17    permitted by law; soliciting a postdated check for the purpose of threatening or instituting

18    criminal prosecution; depositing or threatening to deposit a postdated check prior to the

19    date on the check; taking or threatening to take nonjudicial action to effect dispossession

20    or disablement of property under certain conditions; charging any person for

21    communications regarding the debt; communicating about the debt by postcard; or

22

1  including information on the outside of an envelope that would indicate that the

2  communication is for collection purposes.  *Id.*

3       Whether conduct violates § 1692f requires an objective analysis that takes into

4  account the "the least sophisticated debtor" standard.  *See Donohue v. Quick Collect, Inc.*,

5  592 F.3d 1027, 1030 (9th Cir. 2010); *Guerrero*, 499 F.3d at 934.  The FDCPA is a strict

6  liability statute, which "should be construed liberally in favor of the consumer."  *Clark v.*

7  *Capital Credit & Collection Serv., Inc.,* 460 F.3d 1162, 1175-76 (9th Cir. 2006)

8  (quotation omitted).  The FDCPA "applies to attorneys who 'regularly' engage in

9  consumer-debt-collection activity, even when that activity consists of litigation."  *Heintz*

10  *v. Jenkins*, 514 U.S. 291, 299 (1995).

11       Mr. Mandelas does not contend that Gordon used any of the unfair or

12  unconscionable means of debt collection enumerated in § 1692f.  Rather, Mr. Mandelas

13  invokes the FDCPA's general prohibition against unfair or unconscionable means of debt

14  collection and contends that Gordon violated § 1692f by (1) seeking entry of judgment

15  against Mr. Mandelas without giving him notice; (2) purposefully delaying its efforts to

16  collect the debt in order to collect additional interest; and (3) failing to provide notice of

17  the writ of garnishment as required by Washington law.

18       1.  Seeking Entry of Judgment without Notice

19       Mr. Mandelas alleges that Gordon used an unfair or unconscionable means of

20  collecting a debt in violation of §1692f when it sought entry of judgment against him

21  without giving him proper notice.  Specifically, Mr. Mandelas alleges that Gordon failed

22  to serve him with the summons and complaint in connection with the lawsuit to confirm

ORDER- 7

1   the 2006 arbitration award; that once he became aware of the order and judgment entered

2   against him he told Gordon that he had not been served and was unaware of the

3   judgment; and that Gordon nevertheless filed a writ of garnishment to collect the

4   judgment.  (Am. Compl. ¶¶ 36-41.)  Gordon contends that it is entitled to summary

5   judgment on this claim because, as a matter of law, it was not unfair or unconscionable

6   conduct for it to rely on its process server's facially correct affidavit of service in seeking

7   a default judgment and in filing the writ of garnishment to collect that judgment.

8       In Washington, a "facially correct return of service is presumed valid and, after

9   judgment is entered, the burden is on the person attacking the service to show by clear

10  and convincing evidence that the service was irregular." *Woodruff v. Spence*, 945 P.2d

11  745, 749 (Wash. Ct. App. 1997).  Washington law provides that personal service may be

12  effected by delivering a copy of the summons "to the defendant personally, or by leaving

13  a copy of the summons at the house of his or her usual abode with some person of

14  suitable age and discretion then resident therein."  RCW 4.28.080(15).  The Washington

15  Court of Appeals has upheld a return of service as complying with RCW 4.28.080(15)

16  where the return stated that the process server left copies of the summons and complaint

17  with "John Doe."  *Woodruff,* 945 P.2d at 748-49

18      The court concludes that no reasonable trier of fact would conclude that Gordon's

19  conduct was "unfair or unconscionable" in violation of § 1692f.  I-5 Legal, a registered

20  process server, filed a declaration that it had personally served Mr. Mandelas by leaving a

21  copy of the summons at Mr. Mandelas's address of record with "John Doe, Resident."

22  (Aylworth Aff. Ex. 3.)  Because a facially correct return of service is presumed valid

ORDER- 8

1   under Washington law, it was not unfair or unconscionable for Gordon to rely upon the

2   declaration of service in obtaining an order confirming the arbitration award and

3   converting it to judgment.  The state court accepted the return of service as facially

4   correct when it entered the judgment.  Mr. Mandelas's recourse when he learned of the

5   judgment was to challenge the entry of default in state court by presenting clear and

6   convincing evidence that service was improper.  *Woodruff*, 945 P.2d at 749.  Instead, by

7   his own admission, Mr. Mandelas did nothing.  In light of the fact that Mr. Mandelas

8   never challenged service or the entry of judgment, it also was not unfair or

9   unconscionable conduct for Gordon to file an application for a writ of garnishment to

10  collect the judgment.

11       Mr. Mandelas also argues that Gordon's conduct was unfair or unconscionable

12  because Gordon did not independently investigate and confirm that I-5 Legal had

13  properly served Mr. Mandelas when it knew that I-5 Legal had, on occasion, improperly

14  served debtors in the past.  Mr. Mandelas has not cited competent evidence in support of

15  this assertion.  (*See* supra n.1.)  Even taking this assertion as true, however, the court

16  concludes that no reasonable trier or fact would find that Gordon's conduct was unfair or

17  unconscionable in light of Washington law, which presumes a facially correct return of

18  service to be valid and places the burden of challenging a facially correct return of

19  service on the defaulted defendant.

20       Finally, the court notes that it has found no authority supporting Mr. Mandelas's

21  contention that pursuing a collection action based on a facially correct but factually

22  ineffective return of service is unfair or unconscionable conduct under the FDCPA.

1   Rather, the limited case authority runs contrary to this assertion.  *See, e.g., Dillon v.*

2   *Riffel-Kuhlmann*, 574 F. Supp. 2d 1221, 1223-24 (D. Kan. 2008) (granting summary

3   judgment for the defendant law firm because the court found "no support for the

4   proposition that pursuing a collection action without serving the debtor constitutes a

5   violation of the FDCPA."); *see also Pierce v. Steven T. Rosso, P.A.*, No. Civ. 01-1244

6   DSDJMM, 2001 WL 34624006, at *2 (D. Minn. Dec. 21, 2001) (although improper

7   service might render the collection action a nullity under Minnesota law, it did not

8   provide a legal basis to sustain a claim for violation of § 1692e of the FDCPA).

9          For these reasons, the court grants Gordon's motion for summary judgment on Mr.

10   Mandelas's claim that Gordon violated the FDCPA by seeking entry of judgment without

11   providing notice.

12          2.   Purposefully Delaying Collection Efforts

13          Mr. Mandelas alleges that Gordon used an unfair or unconscionable means of

14   collecting a debt in violation of §1692f when it purposefully delayed its efforts to collect

15   the debt.  Mr. Mandelas contends that the arbitration award was entered on December 14,

16   2006; that judgment based on the arbitration award was entered on January 23, 2008; and

17   that Gordon took no further action in collecting the judgment until it filed an application

18   for a writ of garnishment on September 28, 2009.  (Compl. ¶¶ 47-52.)  Mr. Mandelas

19   argues that Gordon had a motive to delay its collection of the debt because, under its fee

20   agreement with CACV, it collected more money on larger debts.  (Resp. at 10-12; Ehrlich

21   Decl. Ex. I.)  Thus, the longer Gordon allowed interest to accrue on the underlying debt,

22   the more Gordon would eventually earn once it collected the debt.  Gordon counters that

1   it is entitled to summary judgment because it made continuous efforts to contact Mr.

2   Mandelas and to collect the debt; Mr. Mandelas has no evidence that any delay was

3   purposeful; and Mr. Mandelas was aware of the debt by June 2008 but made no efforts to

4   contest or resolve the debt.  The court agrees with Gordon.

5          First, Mr. Mandelas's assertion that no collection activity occurred between

6   January 2008 and September 2009 is not supported by the record.  Rather, the evidence

7   shows that Gordon attempted to contact Mr. Mandelas on multiple occasions during that

8   timeframe.  Gordon filed the application to confirm the arbitration award on October 31,

9   2007.  The state court entered judgment in January 2008, and entered an amended

10  judgment in May 2008.  After the amended judgment was entered, Gordon began to

11  attempt to contact Mr. Mandelas.  (Aylworth Aff. Ex. 9.)  In June 2008, Mr. Mandelas

12  contacted Gordon, and Gordon sent him the documents related to the entry of judgment

13  immediately thereafter.  (*Id.* Exs. 7 & 9; Mandelas Dep. at 18.)  Mr. Mandelas did not

14  contact Gordon after he received the documents, nor did he challenge the entry of

15  judgment or dispute the debt.  Gordon's contemporaneous records show that it attempted

16  to call Mr. Mandelas in July, August, September, and December 2008, as well as in

17  January, February, July, and September 2009.  (Aylworth Aff. Ex. 9.)  In September

18  2009, Gordon prepared the writ of garnishment.  (Ehrlich Decl. E.)  Even viewed in the

19  light most favorable to Mr. Mandelas, this record does not demonstrate an unreasonable,

20  let alone unfair or unconscionable, delay.

21         Second, Mr. Mandelas has presented no evidence that any delay was purposeful.

22  Mr. Mandelas points to the contract between Gordon and CACV as evidence that Gordon

1    purposefully delayed collection of the debt.  Although the contract provides for Gordon

2    to receive a percentage of the collected debt, including a percentage of any accrued

3    interest (*see* Ehrlich Decl. Ex. I), the contract on its own is not evidence that any delay in

4    collecting Mr. Mandelas's account was purposeful.[4]

5           Finally, Mr. Mandelas has directed the court to no authority that delay, alone,

6    constitutes unfair or unconscionable conduct under the FDCPA, and the delay Mr.

7    Mandelas describes is not consistent with the types of unfair or unconscionable conduct

8    proscribed by § 1692f.  *See* 15 U.S.C. § 1692f(1)-(8).  In addition, in light of the

9    undisputed facts that Mr. Mandelas took no action to resolve the debt despite knowing as

10   early as June 2008 that there was an outstanding judgment against him and that Gordon

11   was attempting to collect it, Mr. Mandelas's argument that he "could not possibly have

12   avoided or lessened the subject injury" falls short.  (*See* Resp. at 18.)

13          For the foregoing reasons, the court concludes that no rational trier of fact would

14   conclude that Gordon used an unfair or unconscionable means of collecting a debt by

15   purposefully delaying its collection efforts, and grants Gordon's motion for summary

16   judgment on this claim.

17   _____

18          [4]Mr. Mandelas also relies on a deposition of Mr. Aylworth that he did not file with his
     motion.  (*See* supra n.1.)  Even taking Mr. Mandelas's representations of the contents of that
19   deposition as truthful, however, the court concludes that Mr. Mandelas has not established a
     genuine issue of material fact that there was purposeful delay.  For example, Mr. Mandelas
     makes much of CACV's request that Gordon note Mr. Mandelas's file as "NEMO," which
20   stands for "need money."  (*See* Resp. at 11.)  Mr. Mandelas states that CACV made this request
     on August 10, 2008.  (*See id.*)  CACV's request that Gordon take action on the account is not
21   evidence that Gordon purposefully delayed its collection efforts.  In addition, the court observes
     that this request was made only two months after Gordon responded to Mr. Mandelas's call
     regarding the judgment, and Gordon's records show that it attempted to call Mr. Mandelas four
22   times in August 2008.  (*See* Aylworth Aff. Ex. 9; Mot at 7-8 (summarizing records).)

3.   <u>Failure to Provide Notice of Writ of Garnishment</u>

Mr. Mandelas alleges that Gordon used unfair and unconscionable means of collecting a debt in violation of § 1692f when it failed to provide him notice of the writ of garnishment in violation of Washington law.  Gordon moves for summary judgment on the ground that its conduct was not unfair or unconscionable because it provided the notice required by Washington's garnishment statute.

Washington law sets forth the following requirements for service of a writ of garnishment upon a debtor:

> 1) When a writ is issued under a judgment, on or before the date of service of the writ on the garnishee, the *judgment creditor shall mail or cause to be mailed* to the judgment debtor, by certified mail, addressed to the last known post office address of the judgment debtor, (a) a copy of the writ and a copy of the judgment creditor's affidavit submitted in application for the writ, and (b) if the judgment debtor is an individual, the notice and claim form prescribed in RCW 6.27.140.  In the alternative, on or before the day of the service of the writ on the garnishee or within two days thereafter, the stated documents shall be served on the judgment debtor in the same manner as is required for personal service of summons upon a party to an action.

RCW 6.27.130 (emphasis added).

Gordon submitted to the court a notarized "Affidavit / Return of Mailing of Writ of Garnishment" that states that Gordon served the writ, a copy of the judgment, and the notice and claim form pursuant to RCW 6.27.130 upon Mr. Mandelas on December 3, 2009.  (Aylworth Aff. Ex. 13.)  Mr. Mandelas states that he never received the notice required under the statute.

By its terms, RCW 6.27.130 does not require proof that the debtor actually received the writ.  Instead, it requires proof that the necessary documents were mailed

1   pursuant to the statute.  *See* RCW 6.27.130.  Because the evidence, even when viewed in

2   the light most favorable to Mr. Mandelas, establishes that Gordon mailed notice of the

3   writ of garnishment in accordance with Washington law, the court grants Gordon's

4   motion for summary judgment on Mr. Mandelas's claim based on failure to provide

5   notice of the writ of garnishment in violation of Washington law.

6       **C.**    **WCAA / WCPA Claims**

7         Mr. Mandelas alleges that Gordon violated the WCAA by purposefully delaying

8   the collection of the debt in violation of RCW 19.16.250(14); by failing to provide notice

9   of the writ of garnishment as required under state law;[5] and by conducting collection

10  activities and bringing an action in a Washington state court without being licensed as a

11  collection agency in violation of RCW 19.16.110 and RCW 19.16.260.  Mr. Mandelas's

12  WCPA claims are based on the same alleged violations of the WCAA.[6]  Gordon contends

13  that it is entitled to summary judgment on all of Mr. Mandelas's WCAA and WCPA

14  claims because law firms are not subject to the WCAA.

15

16  _____

17     [5] Mr. Mandelas does not state which provision of the WCAA Gordon allegedly violated
by this conduct.  (*See* Am. Compl. ¶¶ 60-62.)

   [6] Certain violations of the WCAA constitute unfair or deceptive acts or practices

18  occurring in the conduct of trade or commerce within the meaning of the WCPA:

19       The operation of a collection agency or out-of-state collection agency without a
     license as prohibited by RCW 19.16.110 and the commission by a licensee or an

20       employee of a licensee of an act or practice prohibited by RCW 19.16.250 are
     declared to be unfair acts or practices or unfair methods of competition in the

21       conduct of trade or commerce for the purpose of the application of the Consumer
     Protection Act found in chapter 19.86 RCW.

22  RCW 19.16.440.

ORDER- 14

1        1.       A Law Firm May Qualify as a Collection Agency under the WCAA

2        The WCAA defines "collection agency" as "[a]ny person directly or indirectly

3  engaged in soliciting claims for collection, or collecting or attempting to collect claims

4  owed or due or asserted to be owed or due another person."  RCW 19.16.100(2)(a).  The

5  WCAA excludes the following from the definition of "collection agency":

> (c) *Any person whose collection activities are carried on in his, her, or its true name and are confined and are directly related to the operation of a business other than that of a collection agency, such as but not limited to*: Trust companies; savings and loan associations; building and loan associations; abstract companies doing an escrow business; real estate brokers; property management companies collecting assessments, charges, or fines on behalf of condominium unit owners associations, associations of apartment owners, or homeowners' associations; public officers acting in their official capacities; persons acting under court order; *lawyers*; insurance companies; credit unions; loan or finance companies; mortgage banks; and banks;

12  RCW 19.16.100(3)(c) (emphasis added).  Gordon seizes upon the word "lawyers" in this

13  exclusion and argues that the statute categorically exempts law firms from regulation as

14  collection agencies under the WCAA.

15        No published Washington case has addressed whether lawyers are categorically

16  excluded from regulation as a "collection agency" under RCW 19.16.100(3)(c).  In *Trust

17  Fund Services v. Aro Glass Co.*, 575 P.2d 716 (Wash. 1978), the Washington Supreme

18  Court held that an entity created as an alter ego of a law firm was not subject to the CAA.

19  The court observed that:

> Trust Fund was created to provide a convenient means for a law firm to collect debts related to the firm's business.  The firm represented a number of health and welfare and pension trust funds.  In the normal course of business, it was frequently necessary for the funds to bring actions against employers to recover unpaid contributions.  Since the funds were not

1   regarded as legal entities, the suits had to be brought in the names of the
    individual trustees. . . . Trust Fund was created as a non-profit corporation
2   to which the accounts could be assigned, to eliminate the need to bring
    collection actions in the names of the trustees.  Trust Fund has no assets, no
3   separate clients, no employees and no office.  It is merely the alter ego of
    the law firm and its only activities are related directly to that firm's
4   business.

5   *Id.* at 718.  The *Trust Fund* court did not hold that law firms are always excluded from

6   regulation as collection agencies; nor was it confronted with the situation where a law

7   firm's sole business is the collection of debts on behalf of its clients, as Mr. Mandelas has

8   alleged in this case.

9       Recent case authority indicates a growing consensus that the WCAA does not

10  exclude all law firms from regulation as collection agencies.  In a recent unpublished

11  decision, the Washington Court of Appeals considered allegations similar to those at

12  issue in this case and observed that the WCAA does not categorically exclude law firms

13  from regulation:

14      It is clear that some lawyers may fall within the definition of "collection
        agency."  RCW 19.16.100(3)(c) does not entirely exclude lawyers from
15      ever qualifying as a "collection agency."  It merely excludes those who are
        collecting debts "directly related to the operation of a business other than
16      that of a collection agency."

17  *Carter v. Suttell & Associates, P.S.*, No. 63628-6-1, 2011 WL 396038, at *7 (Wash. Ct.

18  App. Jan. 13, 2011) (unpublished decision).[7]  The *Carter* court affirmed the trial court's

19  grant of summary judgment to the law firm because the plaintiff did not present any

20  specific facts, aside from its own assertions, that the law firm was acting as a collection

21  _____

22      [7] Because *Carter* is an unpublished decision of the Washington Court of Appeals, the
    court considers it only as persuasive, rather than precedential, authority.

1   agency.  *Id.* at *8 ("If Suttell indeed was acting as a collection agency, Carter failed to put

2   forth sufficient evidence to reveal an issue of material fact.").

3        In addition, the majority of Washington federal court decisions, including several

4   involving Gordon, have determined that lawyers are not categorically excluded from

5   regulation as "collection agencies" under the WCAA.  *See Lang v. Gordon*, No. C10-

6   0819RSL, 2011 WL 62141, at *2 (W.D. Wash. Jan. 6, 2011); *McLain v. Daniel N.*

7   *Gordon, PC*, No. C09-5362BHS, 2010 WL 3340528, at *8 (W.D. Wash. Aug. 24, 2010);

8   *LeClair v. Suttell & Assoc., P.S.*, No. C09-1047JCC, 2010 WL 417418, at *6 (W.D.

9   Wash. Jan. 29, 2010); *Semper v. JBC Legal Group*, No. C04-2240RSL, 2005 WL

10  2172377, at *3 (W.D. Wash. Sept. 6, 2005).  *But see Motherway v. Daniel N. Gordon*,

11  PC, No. C09-5605RBL, 2010 WL 2803052, at *4-*5 (W.D. Wash. Jul. 15, 2010)

12  (dismissing WCAA claim and noting that Gordon is not a "collection agency" under the

13  WCAA because, while it "specializes in debt collection legal work, it is first and

14  foremost a law firm.").

15        In light of the foregoing authorities, the court concludes that the WCAA does not

16  categorically exclude all lawyers from regulation under the WCAA.  Rather, under the

17  plain language of the statute, a lawyer or law firm is only excluded if its collection

18  activities are "carried on in his, her, or its true name and are confined and are directly

19  related to the operation of a business other than that of a collection agency."  RCW

20  19.16.100(3)(c).

21        Gordon raises two additional arguments, but they are not well taken.  First,

22  Gordon argues that because RCW 19.16.250(5) specifically prohibits collection agencies

ORDER- 17

1    and their employees from "performing any act or acts, either directly or indirectly,

2    constituting the practice of law," it does not make sense to hold that a law firm can be a

3    collection agency under the statute.  The court disagrees.  As the Honorable Robert S.

4    Lasnik points out in *Lang*, "a plain reading of the narrow exemption [in RCW

5    19.16.100(3)(c)] belies that assertion" and "if the legislature had intended such a broad

6    exemption, it could have included it."  *Lang*, 2011 WL 62141, at *2.

7         Second, Gordon argues that if the statute is interpreted to apply to law firms, it is

8    unconstitutional because it purports to regulate the conduct of lawyers and thus violates

9    the separation of powers doctrine.  Here, again, the court adopts Judge Lasnik's analysis:

> [T]he WCAA can be constitutionally applied to attorneys who are engaged
> in collecting debts on behalf of third parties. In essence, lawyers who are
> acting as debt collectors are engaging in the entrepreneurial aspects of law
> rather than practicing law.  Applying the WCAA and CPA to that type of
> conduct does not run afoul of the separation of powers doctrine.  Rather, it
> is no different than applying other generally applicable statutes, such as the
> criminal laws, to attorneys.

14   *Lang*, 2011 WL 62141, at *3 (citing *Short v. Demopolis*, 691 P.2d 163, 170 (Wash.

15   1984)).

16        In sum, the court concludes that law firms are not categorically excluded from

17   regulation as collection agencies under the WCAA.

18        2.   There is a Genuine Issue of Material Fact Regarding Whether Gordon is an
             Unlicensed Collection Agency

20        The court concludes that Mr. Mandelas has established a genuine issue of material

21   fact regarding whether Gordon must be licensed as a collection agency under RCW

22   19.16.110.  First, it is undisputed that Gordon is not licensed as a collection agency in

ORDER- 18

1    Washington.  (*See* Ehrlich Decl. ¶¶ 14-16.)  Second, there is no dispute that Gordon

2    satisfies RCW 19.16.100(2)(a), which defines a "collection agency" as "[a]ny person

3    directly or indirectly engaged in soliciting claims for collection, or collecting or

4    attempting to collect claims owed or due or asserted to be owed or due another person."

5    Gordon's business is based upon collecting claims owed to its clients, including, in this

6    case, CACV.

7           Third, Mr. Mandelas has provided the court with evidence establishing a genuine

8    issue of material fact regarding whether Gordon's collection activities "are carried on in

9    his, her, or its true name and are confined and are directly related to the operation of a

10   business *other than that of a collection agency*."  RCW 19.16.100(3)(c) (emphasis

11   added).  Although Gordon is nominally a law firm, its primary purpose is the collection

12   of consumer debts.  (*See* Ehrlich Decl. Ex. J ("Aylworth Dep. (McLain)") at 36, 55.)

13   Gordon employs only two attorneys; but it employs 13 to 18 non-attorney "collectors" in

14   a "collection department."  (*Id.* at 22-25.)  The collectors attempt to collect debt from

15   consumers before any efforts are made to file suit.  (*Id.* at 23-24.)  Under Gordon's

16   standard processes, its non-attorney collectors attempt to collect debts on behalf of

17   Gordon's clients before Gordon ever files suit, and Gordon undertakes litigation only

18   where "voluntary collection isn't possible."  (*See* Ehrlich Decl. Exs. G ("Dispute

19   Validation Procedure"), H ("Account Flow").)  Gordon has directed the court to no

20   evidence that it conducts any business that is unrelated to its collection activities.  In light

21   of this evidence, the instant case is distinguishable from *Carter*, in which the court

22   affirmed summary judgment for the law firm in part because the plaintiff put forth no

ORDER- 19

1   evidence supporting its assertion that the law firm employed "numerous employees that

2   engage in collections work."  *See Carter*, 2011 WL 396038, at *6-8.

3         Based on the above, the court concludes that Mr. Mandelas has established a

4   genuine issue of material fact regarding whether Gordon's business activities are

5   "confined and are directly related to the operation of a business other than that of a

6   collection agency."  Therefore, Gordon is not entitled to summary judgment on Mr.

7   Mandelas's WCAA and WCPA claims.[8]

8                   **III.   CONCLUSION:**

9         For the foregoing reasons, the court GRANTS in part and DENIES in part

10  Gordon's motion for summary judgment (Dkt. # 47).  The court GRANTS Gordon's

11  motion with respect to Mr. Mandelas's claims that Gordon violated the FDCPA by

12  seeking entry of judgment without notice, by purposefully delaying collection efforts, and

13  by garnishing Mr. Mandelas's bank accounts without notice.  The court DENIES

14  Gordon's motion with respect to Mr. Mandelas's claim that Gordon violated the WCAA

15  and WCPA because Mr. Mandelas has established a genuine issue of material fact

16  regarding whether Gordon is subject to regulation under the WCAA.

17

18

19       [8] Gordon moved for summary judgment on Mr. Mandelas's WCAA and WCPA claims

20  solely on the ground that it is not subject to the WCAA.  However, in light of the court's rulings
    on Mr. Mandelas's FDCPA claims, the court is doubtful that Mr. Mandelas's WCAA and WCPA

21  claims based on Gordon's alleged purposeful delay and improper notice of the writ of
    garnishment remain viable. (*See* Am. Compl. ¶¶ 55-59, 60-62.)  In a separate order, therefore,

22  the court orders Mr. Mandelas to show cause why the court should not grant summary judgment
    on these claims pursuant to Federal Rule of Civil Procedure 56(f)(2).

1    Dated this 31st day of March, 2011.

2

3

4    _____
     JAMES L. ROBART
5    United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22